May it please the court, the matter before you this morning is a rather uncomplicated case involving imported chip placer machines and tape feeders which are used in conjunction with the machines. The chip placer machines are known throughout the industry as quote unquote pick and place machines. They're used as part of systems which assemble print circuit boards. Their role is to lift electronic chips and other electronic components from feeders and to place those electronic components in the printed circuit board. The film was helpful but where is the error? The error, your honor, consists of three different, as far as we're concerned, three different things. The first error is the CIT's narrow interpretation of heading 8428. 8428 which covers among other things the placing and handling of materials is to be read under the explanatory notes and Mitsubishi in one case is to be read broad. In other words that provision is not to be read because of the explanatory notes say that it's supposed to be construed broadly and there was litigation involving 8428 versus 8479 in the Mitsubishi case. The Mitsubishi court adopted the explanatory notes and said in that case, which the government argued by the way, that 8428 is to be construed broadly. But it's certainly not on limitations. No it's not. Where would you draw the line? Probably draw the line and I think that the trial court tried to do this but we don't agree with the trial court's analysis. The trial court, and this is the second portion of our argument as to where the errors took place at the CIT level. The trial court used the so-called active versus passive test to construe limitations on which items are included in heading 8428. They used the CIT that is used specifically in the Mitsubishi 1 case. Mitsubishi 1 concerned machinery for making steel castings and there were perhaps a dozen or so items that were analyzed. And from the Mitsubishi case, the CIT in this case somehow concluded that there was a test that should be used in determining what items are included in heading 8428. And that is a passive versus active test. I think you are correct that the court, CIT used the terms active and passive. But I kind of understood that to be the court speaking in the context of its discussion, in which it came to the conclusion that the primary purpose of the, this is the chip closer, is not just lifting but actually involved in the assembly, particularly because it has the camera and so forth. You're right. I guess what I'm saying is it didn't seem to me that the court was using some kind of active-passive test. It just sort of was making that comment in the context of that discussion. Well, the court specifically pointed to a roller table with respect to an analyzing roller table. A roller table in the context of making steel castings. The court said it was a passive operation. Conversely, the court did not follow through with that reasoning with respect to another part of the steel casting machinery in the Mitsubishi case. And that was a ladle turret. A ladle turret takes the molten steel and the molten steel is poured into the ladle turret. The ladle turret then turns and fills up the castings with, the casting molds with the molten steel, which certainly we believe is an active process. This brings us to the next theory that we're advocating why the CIT should be using the term. We believe that the active-versus-passive analysis is really tantamount to a resurrection of the more-than test, which was disavowed. Again, you're right. The more-than test does seem to have been discarded. But it didn't seem to me that the court was engaging in that kind of analysis. Rather, just looking at what it felt, and you would say wrongly, was the primary function or the principal function of the CIT place. Now, you may disagree with how it came out in that analysis, but it didn't strike me that it was engaging in a more-than analysis. Well, we believe that we respectfully disagree, Your Honor. We think that by using the active-versus-passive test that the judge did, even though the judge did not say, the CIT judge did not say, that it mentioned more-than doctrine. Frankly, when I read the CIT's opinion, the first thing that came to my mind was the judge is using more-than doctrine in this case. And then, when the government moved in a motion to reconsider, in its motion to reconsider, the government used those very words in its motion. In other words, the government said that, in its motion to reconsider, that rather than the court's rationale, that the chip placers are machines that do more than just lift and handle. And we totally agree with that analysis. That is what the court did. The court, even if the court, even if the court would reject the concept that the CIT did not use the more-than analysis, the CIT, nevertheless, in its active-versus-passive rationale to decide this case, what the CIT did, was to construct, perhaps, another judicial test for interpretation of a chair provision, which, under the HDS-US, is prohibited because this court said, in the JDC case, in the year 2000, that those kinds of judicial-made tests to interpret the chair provisions should no longer exist. It should no longer exist, since the HDS came into being in 1989, because those judicial tests, judicial-made tests for chair interpretation, were subsumed because of the general rules of interpretation of the harmony of serious interests. Mr. Zolno, you said earlier that the part there is a simple case. The court found that the chip placers are not lifting, handling, or unloading machinery, which is the heading that you're asking for. Isn't it simple? Isn't that a factual finding, which is subject to a general analysis? Well, I think it's a legal term, interpretation of what lifting and handling meant. Are we interpreting schedule more, or are we reviewing the effect as to the nature of the court material? Well, I think a little bit of both, but more interpreting, the judge interpret the law, the CIT judge interprets the law, and the CIT court would call for it. I'm not evaluating the meaning of lifting, handling, or unloading. I'm talking about the chip placers. Well, neither the government nor the judge below refuted the fact that chip placers lift and unload. That was never refuted, even going back to the negative. But this is a primary function to place the chip. So why isn't it there? Well, the primary function is to place the chips and other ICs. It is done by lifting and placing. There is an armature with a vacuum nozzle, and it takes some kind of electronic component from the feeder and puts it on a bare board. That's exactly what it does. You're concentrating on lifting rather than the handling aspect of that definition. Well, I think it does both. It lifts, and then it handles, it lifts the chip from the feeder. So that's the lifting portion. And then the handling is to put that chip on the bare board as part of an assembly operation. And it is only part of the operation, so it's only one second of the entire operation. In other words, if the, as you may have looked at the video, which I realize is not going to win the Golden Globe Award for best director. No, it's very clear. What you can't see in the video, though, is when the boards leave the chip-placing machine. If you take the boards and you turn them over, the electronic components shake a little bit, and they're going to fall off. There's another step that's involved. There's a step prior to the chip-placer in making the boards, and there's a step subsequent to the chip-placer in making the boards. And that is for the loaded boards to then go into an industrial oven where they're hardened, and not until in the backstop, which, of course, is totally distinct from the chip-placers, you have a board that is a functional board. I wanted to also point out that the judge is mandated. In instances where you have a basket provision, like 8479, to conduct a relative specificity test, which the judge did not do, that is mandated under GRI 1, and that was affirmed by an office court in Sharp Microelectronics. I see. I have one quick question. Were the feeders imported separately? The feeders were imported sometimes separately and sometimes as spare parts. Actually, they were imported with the machines and sometimes separately as spare parts. Thank you. Mr. Stratford. May it please the Court, Your Honors, my name is Bruce Stratford, representing the Humanic States. First, I'd like to address the classification of the chip-placer, and as you can see from the judge's decision, he laid out from his viewing of the video and the drawings that were provided to him by the plaintiff, there's a host of activity that takes place here, and as he concluded, by saying it's a lifting and handling machine, it reduces the overall function to a single process within that overall assembly process. Going now to the active versus passive, the judge looked at the Mitsubishi case, which involved about 30 different components of the continuous casting steel machine, and he concluded, and this Court affirmed, that each one of those separate components, like ladles that drop the molten steel, that move the steel, each one of those components performed a lifting and handling function, and in those components, each component did not play an active role in the manufacture of the steel slabs. In contrast, the judge here looked at the overall machine, the overall chip-placer, and said the primary function of that is to perform an active and integral role in the manufacture of these printed circle assemblies. Let me address now the classification of the feeders. Before we get to the feeders, the Court classified the chip-placers, and 8479, 89, 97 goes up to mechanical appliances. What about a higher classification concerning electromechanical appliances, the self-contained electric motor? Is that possible? The feeders did not address that, Your Honor, and I believe exactly in our motions re-hearing, we indicated that the judge had, in the eight-digit classification nomenclature, had erred in where he put some of these components, and he left out maybe some of the words, like with the comment or such. The judge said, well, since this is on appeal, I will address that subsequently, if it's in a remand, for instance, and we can address that. But in essence, what the judge did was to classify these in the parts provision for the chip-placer. And what he utilized was the… You're talking about the feeders. The feeders, right. So, did you have a question about the chip-placer, Your Honor? Yeah, I had a different question. His question was on the chip-placer. And you told me that no one has raised that. No one raised the question. No one has argued that it should be electro-mechanical appliances. The chip-placers. Yes, Your Honor. What's the… If that is correct, I will withdraw the question. 84798910. 89. That's the mechanical appliance. The page before was the one where both customs and the trial court placed chip-placers. So, the trial court placed it in 847989.97. And it should have been under 8479.90.95. Oh, the reverse is true, Your Honor. Where did customs place it? You're moving the feeders again. The trial court placed it under 8479.89.97. And that's where the customs service had placed it. All right. Move on to the feeders. On the feeders, the trial court utilized Section 16, Note 2 to classify these as parts of chip-placers. Now, Section 16, Note 2 provides for the classification of parts. But there's a paragraph 2A and a paragraph 2B. And the judge went directly to 2B and said that these are parts. Therefore, they ought to be under the parts provision for the… under the 8479 for the chip-placer. But it neglected to look at 2A, which says if a good is in 8479, then it's classifiable as a good and not as a part. That has been affirmed by this court in saying that even if some good is a part of something else, if it is a good itself, then it's classifiable under that particular heading. There are two aspects that's set forth in the explanatory notes about what constitutes an individual function. One is that the machine has to perform a distinct function from the machine it's attached to. For instance, here, the chip feeder and the chip-placer. And there's no controversy between the parties that they do perform distinct functions. One is feeding, motorized feeding, and the other is placing the components on the printed circuit boards. The controversy lies in whether or not the function of the feeder plays an integral and inseparable role in the operation of the chip-placer. We say it does not, and that is why it makes it have an individual function. It's not… that function of the motorized feeder is not integral because the motorized power feeding is not essential to completeness of the chip-placer operation. It really depends on how narrowly you want to define a function. What is that again, Your Honor? Try to understand the lines that you're asking us to draw. The distinction is motorized feeding versus other types of feeding. For instance, you can use stick feeding. You have a tree feeder. All of these are not motorized feeding, and that is a function of the feeder's initial period. Now, it's a different situation if you're considering other types of feeders. But the motorized feeder is a distinct type of feeder, and that's one that's involved in the imports here. The function of the feeder, the motorized feeder here, is not inseparable from the operation of the chip-placer because the chip-placer does not need motorized feeding in order to operate because it can operate with the stick feeder, the tree feeder, these other types of ways to feed the components to a chip-placer. In contrast, to give you an example of something that is integral and inseparable from the operation of the thing it's attached to is a carburetor for an internal combustion engine. There, the carburetor is feeding air and fuel to the engine, and it's inseparable from the operation of the engine because the engine can't operate without this carburetor attached to it. In contrast here, the motorized feeder does not have to be attached to the chip-placer in order for the chip-placer to operate because there are other modes or means to allow the chip-placer to function. Well, there's no evidence on how the non-motorized feeders operate or work. You're asking us to accept distinctions on which you just tell us there's no evidence. There is a distinction that the stick feeder and the tree feeder are not motorized and do not do motorized feeding. Now, there's certainly reasons why you would have motorized in some cases and you would do, say, manual feeding in another case. Perhaps it could be the size of the components, the type of the components, whether they're resistors or other types of electronic components. But in this case, we do have motorized power feeding, and that's why that function is separate and not integral to the operation of the chip-placer. Did I reserve the amendment of time, Your Honor? You may have, depending on how far we get on the cross-feed. So now I'm going to take the time you need to respond on the cross-feed this week. Thank you. I'd like first to address the government's arguments on the feeders, that the feeders are distinct machines and not parts, and specifically comment on what Mr. Stratford just said. First of all, the feeders are inseparable from the chip-placing machines. They must be connected to the chip-placer to perform the function. They are designed to operate exclusively with these chip-placers. In other words, as we pointed out in our brief, the Fuji chip-placers can only operate with the chip-placers, or vice versa, the Fuji feeders can only operate with the Fuji chip-placers. So they're useless without being connected to a chip-placer. Therefore, they must be classified as parts, not machines, under the Barron test. In Barron, the parts are defined as items dedicated for use solely with another article that is not a separate and distinct commercial item. Here, the feeders are parts. They cannot operate without being connected to the chip-placers. In fact, they have no commercial value unless they are sold for use with the chip-placers. I'd like to also now go back to arguments or questions, actually, that the Court raised during my initial arguments with respect to lifting and handling. I think that the test is, what is the primary function of the items included under heading 8428? We believe the primary function, the only function for the chip-placers, is lifting and handling. Neither the government nor the CIT pointed to any function other than lifting and handling. And as I said initially, neither the government nor the judge below refuted the notion that the chip-placers are lifting and handling machines. Rather, the judge said these go beyond lifting and handling because they're part of an assembly operation, which they are. We never denied that the chip-placers do operate as an assembly. They are crucial to the assembly of courts' PCs. You signed a motion to inscribe the heading 8428, lifting, handling, and loading, as placing and constructing. Once again, isn't the real issue what the chip-placers do rather than the construction? And the chip-placers do lift and handle the chips and other electronic devices and put them on the board. They are industrial robots, and that's what they are specifically designed to do, as we pointed out in our brief below, via the testimony. But they're not just cranes and lifters. Oh, they're much more sophisticated than that. They help to construct the instruments. Well, again, they are part of the process of the assembly of courts, but they are only one segment of that process, not the entire process. And really, because a machine is part of an assembly operation, it does not mean that that machine cannot be classified under 8428, an examination of the Mitsubishi One case would lead to that conclusion. Any more questions? Thank you, Mr. Zalman. Mr. Strathclyde. Addressing the feeder classification, Your Honor, and what the plaintiff's counsel has said, it's not that the question of whether the machines themselves, the two machines, the feeder is attached to the chip laser. It's not whether they're inseparable or integral to that machine. If you look at the explanatory notes, they say the function has to be separate and not integral, and that's what we have said. We agree that the feeders are parts, but if you look at Section 16, Note 2A, that addresses parts, but parts that have an individual function, parts that are goods themselves, and we say that the court erred by saying the feeders are not goods themselves. Thank you, Your Honor. Mr. Strathclyde. Thank you, Mr. Strathclyde and Mr. Zalman. Thank you, Your Honor.